*E-FILED*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ARTEMIO GONZALES,

    Petitioner,

v.

GEORGE LEOTTI, Warden,

    Respondent.

No. C 11-3235 RMW (PR)

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the petition should not be granted. Respondent has filed an answer addressing the merits of the petition. Although given an opportunity, petitioner has not filed a traverse. Having reviewed the briefs and the underlying record, the court concludes that petitioner is not entitled to relief based on the claims presented and DENIES the petition.

**BACKGROUND**

Petitioner was charged and convicted by a jury of the following 11 counts: (1) kidnapping of Jane Doe I ("Ellen"); (2) attempted voluntary manslaughter of Ellen; (3) assault upon Ellen with intent to commit rape; (4) attempted forcible rape of Ellen; (5) assault with force likely to produce great bodily injury upon Ellen; (6) assault upon Jane Doe II ("Sarah") with intent to commit rape; (7) unlawful sexual intercourse with a minor, Sarah; (8) oral copulation of

1   a person under 16, Sarah; (9) lewd act upon a child, Sarah; (10) false imprisonment of Sarah by
2   violence; and (11) misdemeanor possession of child pornography.  (Resp. Ex. E at 1.)  The jury
3   found true several enhancements.  (Id. at 2.)  After a remand for re-sentencing, the trial court
4   sentenced petitioner to a determinate term of 13 years consecutive to an indeterminate term of
5   life with the possibility of parole.  (Resp. Ex. J at 2.)

6        At trial, the prosecution presented evidence that, on April 11, 2004, 15-year old Sarah
7   began chatting online with petitioner after dinner.  (Resp. Ex. E at 2.)  Sarah and petitioner had
8   been communicating for the previous two months.  (Id.)  During the conversation, Sarah told
9   petitioner that she wanted to meet him in person, and told him she would be able to meet him
10  after her mother went to sleep.  (Id.)  Around midnight, petitioner called Sarah and she left her
11  house to meet him.  (Id.)  Petitioner was driving a white jeep, told Sarah that he knew about a
12  vacant apartment, and drove them to that apartment complex.  (Id.)  They sat in the carport for
13  about 15-20 minutes, drinking a bottle of Southern Comfort that petitioner had brought.  (Id.)
14  Then, they went into the vacant apartment.  (Id.)  They played with a red ball that they found in
15  the apartment before petitioner and Sarah began kissing and making out.  (Id. at 2-3.)  Petitioner
16  took off Sarah's pants, and Sarah noticed that petitioner was naked.  (Id. at 3.)  Sarah backed
17  away and petitioner got on top of her and held her wrists.  (Id.)  Sarah felt petitioner's penis
18  penetrate her vagina and she tried to crawl away.  (Id.)  Petitioner went to the bathroom to
19  masturbate and when he returned, Sarah said she had to go home because it was getting late.
20  (Id.)  Sarah was concerned about whether petitioner would be able to drive because he had been
21  drinking throughout the evening.  (Id.)

22        Around 3:00 a.m., petitioner and Sarah left the apartment, bringing the red ball with
23  them.  (Id.)  As they were driving, Sarah noticed that petitioner's car was low on gas, so they
24  stopped by a gas station.  (Id. at 3-4.)  After petitioner tried to convince the gas attendant to trade
25  the red ball for food, Sarah believed that petitioner was "really drunk" and went to pay for the
26  gas.  (Id. at 4.)  After they left the gas station, petitioner drove past Sarah's street, down a dirt
27  road with no other houses or streetlights.  (Id.)  Sarah began getting nervous and tried to get out
28  of the car.  (Id.)  Petitioner grabbed her hair and pulled her back.  (Id.)  Sarah asked if petitioner

was going to rape her, and he responded, "There's nothing else that I can do," and "It's either . . . you're going to give me a blow job or do me." (Id.) Sarah told petitioner that she had to go home because her parents were going to wake up and notice she was not home. (Id.) Petitioner agreed and said he would meet her the next night. (Id.) Petitioner drove her home, and Sarah recorded the license plate number of petitioner's jeep and went to bed. (Id.) When she couldn't sleep, she called 911 and reported an attempted rape. (Id.)

At about 4:17 a.m., Officer Thomas Larkin was dispatched to Sarah's house. She gave him a physical description of petitioner as well as the license plate number, showed Officer Larkin petitioner's apartment complex where the vacant apartment was, and picked petitioner's picture out of a photo line-up. (Id. at 4-5.) At around 10:00 a.m., Sarah was examined by a sexual assault nurse. (Id. at 5.) The nurse observed that Sarah had scratches on her wrist, a small tear on her vagina, and petechiae on her cervix. (Id.) According to the nurse, the injuries were consistent with Sarah's description of the incident. (Id.)

That same day, Ellen was working as a prostitute in Salinas. (Id.) Around 4:00 a.m., on April 11, 2004, Ellen and a male friend were walking on a street in Salinas when petitioner drove up in his jeep. (Id.) Petitioner honked his horn, and Ellen asked if he wanted a date. (Id.) Petitioner said yes, and Ellen got into the jeep. (Id.) As petitioner was driving, Ellen became concerned because petitioner seemed agitated and was drinking from a large liquor bottle. (Id.) When Ellen noticed that there were fewer houses around, she asked petitioner to take her back. (Id.) Petitioner said they would not return until they had sex, so Ellen asked petitioner for payment to reassure her that everything was going to be fine. (Id. at 5-6.) When petitioner said he had no money, Ellen became scared. (Id. at 6.) Petitioner eventually pulled over to the side of the road, grabbed Ellen, and told her to orally copulate him. (Id.) After a struggle, Ellen freed herself, exited the jeep, and began running and screaming for help. (Id.) Petitioner drove alongside Ellen, trying to convince her to get back into the car. (Id.) When she refused, petitioner got out and chased Ellen on foot until he caught her, pulled her to the ground, and punched her in the face and chest. (Id.) Petitioner continued to assault Ellen and eventually began ripping off her necklace and clothes. (Id.) Petitioner dragged Ellen into a muddy

1  irrigation ditch and began to strangle her.  (Id.)  At one point, petitioner pushed her head into the
2  muddy water until she eventually lost consciousness.  (Id.)  When Ellen woke up, her body was
3  covered with water and petitioner was gone.  (Id.)
4        At around 7:00 a.m., on April 11, 2004, Scott Lopez was driving along Hitchcock Road
5  when he spotted Ellen, who was naked and covered in mud.  (Id. at 7.)  He pulled over to help
6  her and called 911.  (Id.)  Detective Janet Schaefer met with Ellen at the hospital emergency
7  room.  (Id.)  Ellen was caked with mud, and even had mud in her mouth and between her teeth.
8  (Id.)  Ellen had abrasions on several areas of her body and stated that she did not have those prior
9  to her meeting with petitioner.  (Id.)  Ellen described petitioner and said that he was driving a
10  white jeep.  (Id.)
11        The police determined that Ellen's description was similar to the vehicle they were
12  investigating at petitioner's apartment complex and believed both cases involved the same
13  perpetrator.  (Id.)  Ellen identified petitioner from a photo line-up.  (Id.)
14        At the hospital, Ellen's CAT scan revealed a subdural hematoma and skull fractures on
15  either side of her head.  (Id.)  In addition, Ellen's injuries were consistent with her history of
16  attempted strangulation.  (Id. at 8.)
17        At 9:20 a.m., the police went to petitioner's apartment, and after petitioner refused to
18  come to the door, the police kicked the door in and arrested petitioner.  (Id.)  Sergeant Molfino
19  detected an odor of alcohol on petitioner's breath, but noticed petitioner was not staggering nor
20  was his speech slurred.  (Id.)  Petitioner had various abrasions and a bruise, and refused to
21  submit a blood sample.  (Id.)  The police seized petitioner's jeep and found large amounts of
22  mud on its interior and exterior.  (Id.)
23        At trial, petitioner's girlfriend, Michelle Anderson, testified that on the evening of April
24  11, 2004, she fell asleep around 9:00 p.m.  (Id. at 9.)  Around 6:32 a.m., Anderson realized
25  petitioner was not in bed, and heard the bathroom fan and water running in the bathroom.  (Id.)
26  Anderson went to the bathroom and found petitioner, who was covered in mud, trying to rinse
27  his clothes in the bathtub.  (Id.)  Petitioner would not answer any of her questions.  (Id.)
28  Petitioner took a shower and asked Anderson to forgive him, but would not tell her for what she

1  should forgive him. (Id.) Anderson went back to sleep until the police arrived. (Id.) Anderson
2  also testified that at some point, petitioner had fallen off a ladder and had to have stitches. (Id.)
3  Petitioner began having migraines and was fired from his job. (Id.) After the accident,
4  Anderson stated that petitioner seemed more withdrawn and quiet. (Id.) Anderson testified that
5  petitioner drank often, and once they were arguing about his drinking when petitioner pushed her
6  onto the bed. (Id. at 10.) Petitioner testified that this argument occurred about a week after his
7  accident. (Id.)

8        Petitioner also stated that after his fall, he began experiencing constant headaches, dizzy
9  spells, difficult sleeping, and vision problems. (Id.) Petitioner felt he also seemed to be more
10 aggressive and impulsive than he used to be. (Id.) After the accident, petitioner saw doctors and
11 although a doctor had obtained a brain image, petitioner had not received any treatment for a
12 brain injury. (Id.)

13       Petitioner testified that on the night of April 10, 2004, petitioner picked up Sarah and
14 went to the apartment complex. (Id. at 10-11.) Petitioner's testimony reflected that he orally
15 copulated Sarah, but that the events were consensual. (Id. at 11.) Afterward, Sarah wanted
16 petitioner to take her home so he complied, but was angry because he felt that Sarah "got what
17 she wanted" and wanted to go home quickly. (Id. at 11-12.) Sarah became angry at how
18 petitioner was acting dismissive and told him that she was going to call the cops on him. (Id. at
19 12.)

20       Then, petitioner testified that he picked up Ellen, but they never discussed sexual favors
21 or money even though he had a feeling she was a prostitute. (Id.) Petitioner drove Ellen to
22 Hitchcock Road, parked, and turned off the car. (Id.) He noticed that Ellen had a scab and a
23 "bunch of marks" on her forehead. (Id.) Petitioner told Ellen that he just wanted to talk but did
24 not want to do anything. (Id.) Ellen told him that she needed to make money and asked for him
25 to take her back. (Id.) At that point, petitioner noticed that his watch was missing from where
26 he had left it on the parking brake, and demanded his watch back from Ellen. (Id.) After Ellen
27 denied having the watch, petitioner grabbed her and Ellen slapped his forearm. (Id.) She got out
28 of the car and began running, so petitioner chased her. (Id. at 12-13.) Ellen fell into a large

1  puddle, and petitioner also slipped and fell into the same puddle. (Id. at 13.) Ellen was fully
2  submerged, so petitioner pulled her out of the water. (Id.) Ellen apologized for taking
3  petitioner's watch, and petitioner grabbed his watch back from Ellen's waist. (Id.) Ellen
4  apologized and told petitioner he could do whatever he wanted with her. (Id.) Petitioner told
5  Ellen to take off her clothes, and after her put his hand in her vagina, stopped himself, got mad,
6  and left. (Id.)

   The prosecution introduced rebuttal evidence from petitioner's ex-wife, Lisa Seaton, who
8  stated that in May 2002, petitioner was intoxicated and they argued about putting their baby to
9  sleep. (Id. at 14.) After Seaton ended up putting the baby to bed, petitioner entered the bedroom
10 with a steak knife, and threatened to kill Seaton in her sleep. (Id.)

## DISCUSSION

A.   Standard of Review

   This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

   "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially

1  indistinguishable facts." Williams, 529 U.S. at 412-13.  A state court decision is an
2  "unreasonable application of" Supreme Court authority, falling under the second clause of
3  § 2254(d)(1), if the state court correctly identifies the governing legal principle from the
4  Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's
5  case." Id. at 413.  The federal court on habeas review may not issue the writ "simply because
6  that court concludes in its independent judgment that the relevant state-court decision applied
7  clearly established federal law erroneously or incorrectly." Id. at 411.

8        Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination
9  will not be overturned on factual grounds unless objectively unreasonable in light of the
10 evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.

11       In determining whether the state court's decision is contrary to, or involved an
12 unreasonable application of, clearly established federal law, a federal court looks to the decision
13 of the highest state court to address the merits of a petitioner's claim in a reasoned decision.
14 LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir. 2000).  Here, that decision is the California
15 Court of Appeal.

16 B.    Petitioner's Claims

17       As grounds for federal habeas relief petitioner claims that: (1) trial counsel was
18 ineffective for failing to raise a diminished capacity defense at trial; (2) the trial court erred in
19 instructing the jury with CALJIC 17.41.1; (3) the trial court violated Apprendi, Cunningham,
20 and Blakely by imposing consecutive terms for counts 2 and 3 because the crimes involved a
21 single criminal objective; (4) the trial court erred in imposing the upper term on count 6 and
22 consecutive terms on counts 2, 6, 7, and 8, in violation of Cunningham and Blakely; (5) the life
23 sentence imposed on count 1 violated petitioner's right against multiple punishments for the
24 same offense; (6) petitioner's right to a speedy trial was violated; and (7) the trial court violated
25 petitioner's right to counsel when it did not inquire into his Marsden motion.

26     1.    Ineffective assistance of counsel

27       Petitioner claims that the trial court erred in denying petitioner's motion for a new trial
28 based upon ineffective assistance of counsel.  Specifically, petitioner asserts that counsel should

1  have raised a diminished capacity defense, called neuropsychologist Dr. Winkel as a witness,
2  and brought in a DNA expert to testify.
3      The California Court of Appeal summarized the evidence presented at the motion for a
4  new trial. (Id. at 14-20.) Initially, Arthur Kaufmann was petitioner's trial counsel. (Id. at 15.)
5  In April 2004, Dr. Fithian evaluated petitioner to determine whether he was competent to stand
6  trial. (Id.) In May 2004, the trial court found petitioner competent. (Id.) On June 9, 2005,
7  Terrance McCleerey was substituted as defense counsel as Kaufmann had a conflict of interest.
8  (Id.) That same day, because McCleerey had doubt about petitioner's sanity, the trial court
9  appointed Dr. Finnberg to evaluate petitioner's competency. (Id.) About two weeks later, based
10 on Dr. Finnberg's report, the trial court found petitioner to be competent. (Id.) After trial, the
11 court granted petitioner's motion to substitute Eugene Martinez as defense counsel, and in
12 January 2006, petitioner filed a motion for new trial based on ineffective assistance of counsel.
13 (Id.)
14     Petitioner submitted three reports in support of his motion: (1) a May 2004 report and
15 evaluation by Dr. Fithian; (2) an undated report by Dr. Thomspon regarding a SPECT brain
16 scan; and (3) an August 2005 report by Dr. Winkel, who examined and tested petitioner in
17 connection with a worker's compensation claim. (Id.) Attorney Kaufmann submitted a
18 declaration stating that he had spent approximately 200 hours working on the case, which
19 included a substantial number of hours pursuing mental defense issues, including the ability to
20 form a specific intent. (Id. at 17.) Attorney McCleerey also submitted declarations, in which he
21 stated that he spoke with Kaufmann about the issue regarding whether Dr. Thompson's report
22 and other evidence could negate petitioner's ability to form specific intent. (Id.) McCleerey did
23 not receive Dr. Winkel's report, but spoke with Dr. Winkel prior to trial and learned that Dr.
24 Winkel could not testify that petitioner was mentally incompetent, nor could he say that there
25 was a question regarding petitioner's specific intent. (Id.)
26     At the motion for new trial hearing, Attorney Kaufmann also testified that he learned
27 about brain scans by consulting with Dr. Fithian and a civil attorney who worked in the area of
28 brain injuries. (Id.) Based on his research and conversations, Attorney Kaufmann decided not to

proceed with a defense based on petitioner's head injury and discussions with Dr. Thompson and Dr. Fithian, because one of the difficulties with linking petitioner's brain injury to the criminal behavior. (Id. at 17-18.) Further, Attorney Kaufmann was concerned with the amount of alcohol that petitioner had ingested over the course of the night. (Id. at 17-18.) Attorney Kaufmann conveyed all the case material to Attorney McCleerey and discussed all the issues and possible defense issues with him as well. (Id. at 18.)

Attorney McCleerey, who represented petitioner at trial, spoke with Attorney Kaufmann, read Dr. Thompson's report, and spoke with Dr. Thompson and Dr. Winkel. (Id.) Although Dr. Winkel's report referred to the possibility that petitioner's head injury would have affected his functioning, when McCleerey asked Dr. Winkel whether he could say whether it could have affected petitioner's ability to form a specific intent, Dr. Winkel stated that he could not testify positively about that issue. (Id. at 18-19.) Based on his research and investigation, Attorney McCleerey determined that he would not present a defense based on the psychiatric evidence. (Id. at 19.)

The prosecution also presented an April 20, 2004 report from Dr. Munday, who had examined petitioner about a year and a half after petitioner's head injury, and about five months before the charged offenses. (Id.) An MRI of petitioner's head after the accident was normal. (Id.) According to Dr. Munday, petitioner assumed that petitioner had suffered a mild concussion, but found no results to suggest the difficulties that typically flowed from a concussion or minor brain injury. (Id.) Further, Dr. Munday did not find any evidence of executive dysfunction. (Id.)

The California Court of Appeal rejected petitioner's claim. After properly identifying Strickland v. Washington, 466 U.S. 668 (1986), as the seminal case regarding ineffective assistance of counsel claims, the appellate court concluded that Attorney McCleerey's "investigation of a possible psychiatric defense indicated that no expert witness would have testified that defendant suffered from some mental disease, defect, or disorder that precluded him from actually forming the mental state required for each specific intent crime, and thus his representation did not fall below an objective standard of reasonableness." (Id. at 22.) Further,

1    the court stated that petitioner had not shown that Attorney McCleerey should have known that
2    further investigation would have produced that evidence. (Id.)

3      In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner
4    must establish two things. First, he must establish that counsel's performance was deficient, i.e.,
5    that it fell below an "objective standard of reasonableness" under prevailing professional norms.
6    Strickland, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's
7    deficient performance, i.e., that "there is a reasonable probability that, but for counsel's
8    unprofessional errors, the result of the proceeding would have been different." Id. at 694. A
9    reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

10     With regard to counsel's performance, the relevant inquiry is not what defense counsel
11   could have done, but rather whether the choices made by defense counsel were reasonable. See
12   Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998). Judicial scrutiny of counsel's
13   performance must be highly deferential, and a court must indulge a strong presumption that
14   counsel's conduct falls within the wide range of reasonable professional assistance. See
15   Strickland, 466 U.S. at 689. "Although courts may not indulge 'post hoc rationalizations' for
16   counsel's decisionmaking that contradicts the available evidence of counsel's actions, . . . neither
17   may they insist counsel confirm every aspect of the strategic basis for his or her actions. There
18   is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others
19   reflects trial tactics rather than 'sheer neglect.'" Harrington v. Richter, 131 S. Ct. 770, 790
20   (2011) (citations omitted); see also id. at 791 ("an attorney may not be faulted for a reasonable
21   miscalculation or lack of foresight or for failing to prepare for what appear to be remote
22   possibilities"); Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011) ("a trial court 'must indulge
23   [the] strong presumption' that counsel made all significant decisions in the exercise of
24   reasonable professional judgment.") (quoting Strickland, 466 U.S. at 689-90).

25     Here, based on statements by both Attorney Kaufmann and Attorney McCleerey, it was
26   reasonable for the state appellate court to find that Attorney McCleerey did not rendered
27   deficient performance when he was unable to find affirmative evidence that petitioner's brain
28   injury could have negated a finding of specific intent. Further, although Attorney McCleerey did

not call Dr. Winkel as a witness, he did speak with Dr. Winkel, who confirmed that he could not testify that petitioner's brain injury had an effect on petitioner's ability to form a specific intent. See Williams v. Woodford, 384 F.3d 567, 611 (9th Cir. 2004) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense.").

Finally, as to petitioner's claim that counsel should have hired a DNA expert to examine DNA results in order to demonstrate that petitioner was not guilty of Count 7 (unlawful sexual intercourse with a minor), petitioner fails to support this assertion with any evidence. Here, the record shows that during closing statements, defense counsel argued that the DNA examination on Sarah showed saliva on Sarah's neck and vagina, which was consistent with petitioner's version of events that he kissed her neck and performed oral sex on her. (Resp. Ex A, Vol. 2 at 319.) The DNA test did not show semen or seminal fluid in or around Sarah's vagina. (Id.) However, the nurse examiner who examined Sarah noted that she had a small tear on her vagina and petechiae on her cervix, which were injuries commonly caused by penetration. (Resp. Ex. E at 5.) Expert testimony is necessary when lay persons are unable to make an informed judgment without the benefit of such testimony. See Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1999) (jury informed that plaintiff exposed to neurotoxic chemicals but not informed of the ramifications of such exposure). Petitioner has not included the DNA results, nor has petitioner even summarized what the results said. Petitioner has also not presented any evidence that an expert's testimony could have assisted the jury in any way, or that the jury could not have come to the same conclusion on its own from reading the DNA results or listening to defense counsel's arguments. Without any specific evidence or non-conclusory arguments, petitioner has failed to demonstrate that counsel's decision not to call a DNA expert fell below an objective standard of reasonableness. See id. at 688.

Because the court concludes that the state appellate court's determination was reasonable that counsel did not render deficient performance, it is unnecessary to address the prejudice prong of the Strickland test. See Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Accordingly, petitioner is not entitled to habeas relief on this claim.

### 2. CALJIC No. 17.41.1

Petitioner claims that instructing the jury pursuant to CALJIC No. 17.4 1.1 – the jury nullification instruction – undermined the privacy and secrecy of jury deliberations. Unfortunately for petitioner, the Ninth Circuit has held that CALJIC No. 17.41.1 is not contrary to, or an unreasonable application of, any existing Supreme Court precedent. See Brewer v. Hall, 378 F.3d 952, 955-56 (9th Cir. 2004) (rejecting challenge to CALJIC No. 17.41.1 under 28 U.S.C. § 2254(d)). Petitioner is not entitled to federal habeas relief on his instructional error claim.

### 3. Sentencing error for Counts 2 and 3

Petitioner claims that the trial court violated California Penal Code § 654 by imposing consecutive terms for Count 2 (attempted voluntary manslaughter) and Count 3 (assault on Ellen with intent to commit rape) in light of the life term imposed on Count 1 (kidnapping Ellen with intent to commit rape) because all these crimes involved one single criminal objective. Petitioner further argues that this consecutive sentencing violated Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004), and Cunningham v. California, 549 U.S. 270 (2007).

Petitioner's allegation that the imposition of consecutive sentencing violated California Penal Code § 654 is not cognizable in a federal habeas proceeding. See Swarthout v. Cooke, 131 S. Ct. 859, 861-62 (2011) (reaffirming that federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law); Wilson v. Corcoran, 131 S. Ct. 13, 16 (2010) ("it is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts.").

Petitioner's additional argument that the consecutive sentencing violated Apprendi, Blakely, and Cunningham is foreclosed because clearly established law has determined that consecutive sentences are decisions not typically reserved for the jury, and thus, do not implicate the Sixth Amendment. See Oregon v. Ice, 555 U.S. 160, 168-69 (2009) (declining to extend Apprendi to a state's sentencing system that gives judges discretion to determine facts allowing imposition of consecutive or concurrent sentences for multiple offenses, noting that

determination of consecutive versus concurrent sentences is traditionally not within the function of the jury); see, e.g., Shaw v. Kirkland, 460 Fed. Appx. 699, 701 (9th Cir. 2011) (unpublished memorandum disposition).

Accordingly, petitioner is not entitled to habeas relief on this claim.

4.  Sentencing error for Count 6

Petitioner claims that the trial court erred in imposing the upper term on Count 6, in violation of Cunningham and Blakely.[1] However, as respondent notes, upon remand, the trial court sentenced petitioner to one-third of the middle term, i.e., one year and four months. (Resp. Ex. G, CT 4, 7-8). Thus, petitioner's claim is moot, and he is not entitled to habeas relief on this claim.

5.  Double jeopardy

Petitioner claims that the life sentence imposed on Count 1 (kidnapping Ellen with the intent to commit rape) violated his right to be free from multiple punishments. The Double Jeopardy Clause of the Fifth Amendment guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The guarantee against double jeopardy protects against (1) a second prosecution for the same offense after acquittal or conviction, and (2) multiple punishments for the same offense. See Witte v. United States, 515 U.S. 389, 395-96 (1995). In the federal courts the test established in Blockburger v. United States, 284 U.S. 299, 304 (1932) ("same elements" test: "whether each provision requires proof of a fact which the other does not"), ordinarily determines whether crimes are indeed separate and whether cumulative punishments may be imposed. See Rutledge v. United States, 517 U.S. 292, 297 (1996). The Double Jeopardy Clause is not violated if "each [offense] requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304.

However, as respondent points out, petitioner does not single out any other offense that was duplicative of Count 1. With regard to Ellen, petitioner was not charged with more than one

---

[1] Petitioner also argues that the consecutive sentence terms on Counts 2, 6, and 7 also violate Cunningham, but, as stated above, that claim is foreclosed by Oregon v. Ice, 555 U.S. 160, 168-69 (2009).

1  count of the same crime. (CT 118-21.) Moreover, each of the crimes against Ellen is defined
2  differently, with different elements. (Id.) To the extent petitioner is actually arguing that he was
3  not aware that he was facing a life sentence, this fails to state a federal habeas claim.

4     Accordingly, petitioner is not entitled to federal habeas relief on this claim.

5     6.     Speedy Trial

6  Petitioner claims that this right to speedy trial was violated. Respondent argues that
7  petitioner has not exhausted this claim, and should be denied on the merits. The court may deny
8  an unexhausted claim on the merits if it is not colorable. See 28 U.S.C. § 2254(b)(2) ("[a]n
9  application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure
10 of the applicant to exhaust the remedies available in the courts of the State"); Cassett v. Stewart,
11 406 F.3d 614, 624 (9th Cir. 2005) (holding that an unexhausted petition may be denied on the
12 merits when it is perfectly clear that the applicant does not raise even a colorable federal claim).

13 A speedy trial is a fundamental right guaranteed the accused by the Sixth Amendment to
14 the Constitution and imposed by the Due Process Clause of the Fourteenth Amendment on the
15 states. Klopfer v. North Carolina, 386 U.S. 213, 223 (1967). Courts must apply a flexible
16 "functional analysis," Barker v. Wingo, 407 U.S. 514, 522 (1972), and consider and weigh the
17 following factors in evaluating a Sixth Amendment speedy trial claim: (1) length of the delay;
18 (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the
19 defendant. Doggett v. United States, 505 U.S. 647, 651 (1992); Barker, 407 U.S. at 530.

20 Petitioner does not actually argue any of these factors. Rather, petitioner states that he
21 wanted the result of trial to come quickly, and requests a re-trial because petitioner believes that
22 his mind is more rational and stable now. In considering the four factors to determine whether
23 petitioner's speedy trial rights were violated, the court concludes that they were not.

24 First, petitioner was arraigned on June 16, 2004. (CT 86.) Counsel for petitioner
25 requested and received five requests to continue the trial date, and the trial court vacated one trial
26 date after petitioner's counsel expressed doubt to petitioner's competency. (CT 96, 115, 117,
27 141, 407, 162.) Petitioner's trial began on August 15, 2005. (CT 205.) The 14-month delay is
28 presumptively prejudicial and weighs in favor of petitioner. See Doggett, 505 U.S. at 652 n.1.

However, presumptive prejudice is not dispositive without weighing the other factors. <u>United States v. Gregory</u>, 322 F.3d 1157, 1162 (9th Cir. 2003).

Second, the court must consider "whether the government or the criminal defendant is more to blame" for the delay. <u>Doggett</u>, 505 U.S. at 651. Deliberate delay by the government "'to hamper the defense' weighs heavily against the prosecution." <u>Vermont v. Brillon</u>, 129 S. Ct. 1283, 1290 (2009) (quoting <u>Barker</u>, 407 U.S. at 531). "In contrast, delay caused by the defense weighs against the defendant under standard waiver doctrine." <u>Brillion</u>, 129 S. Ct. at 1290. Because defense attorneys act as a defendant's agent, and are not state actors, "delay caused by the defendant's counsel is also charged against the defendant" whether counsel is privately retained or appointed by the state. <u>Id.</u> at 1290-91. The Ninth Circuit considers reason for delay to be the focal point of the inquiry. <u>See</u> <u>United States v. King</u>, 483 F.3d 969, 976 (9th Cir. 2007) (reasons for delay weigh heavily against finding a Sixth Amendment violation where district judge granted defendant's requests for continuances, defendant was explained his right to a speedy trial before agreeing to continuances, the case was extraordinarily complex, and defendant substituted a new attorney halfway through the proceedings). Here, most of the delays were requested by counsel and petitioner agreed to approximately half of them. Thus, this factor weighs against petitioner.

Third, a finding that a defendant repeatedly asserted his speedy trial right is entitled to strong evidentiary weight under <u>Barker</u>. <u>United States v. Loud Hawk</u>, 474 U.S. 302, 314 (1986). However, if a defendant asserts his speedy trial rights after requesting continuances, this factor does not weigh in favor of finding speedy trial violation. <u>United States v. Corona-Verbera</u>, 509 F.3d 1105, 1116 (9th Cir. 2007). Here, petitioner did not assert his right to a speedy trial until June 9, 2005 – approximately two months before trial commenced. (RT 757-60.) This factor also weighs against petitioner.

Finally, whether a defendant must show actual prejudice depends on whether it is he or the government who is responsible for the delay. <u>United States v. Lam</u>, 251 F.3d. 852, 859 (9th Cir. 2001). A defendant cannot rely solely on the mere "passage of time" to show prejudice. <u>See</u> <u>King</u>, 483 F.3d at 977 (citing <u>United States v. MacDonald</u>, 456 U.S. 1, 8(1982)); <u>see, e.g.</u>,

1  Corona-Verbera, 509 F.3d at 1116 (finding no prejudice from "presumptively prejudicial" delay
2  of eight years because government had acted with reasonable diligence and defendant did not
3  demonstrate specific prejudice). Here, petitioner does not attempt to show prejudice at all, and
4  thus, this factor weighs against petitioner as well.
5       After weighing the necessary factors, the court concludes that the state court's rejection
6  of this claim was not contrary to or an unreasonable application of clearly established Supreme
7  Court law.

     7.    Marsden motion

9       Petitioner claims that he made a Marsden motion approximately one week prior to trial,
10 and the trial court refused to "look into" it. Respondent again argues that petitioner has not
11 exhausted this claim, and should be denied on the merits. Because the claim is without merit, the
12 court will forego a determination of whether the claim is also exhausted. See 28 U.S.C. §
13 2254(b)(2).
14      The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment
15 right to counsel and is properly considered in federal habeas. Bland v. California Dep't of
16 Corrections, 20 F.3d 1469, 1475 (9th Cir. 1994), overruled on other grounds by Schell v. Witek,
17 218 F.3d 1017 (9th Cir. 2000) (en banc). The Ninth Circuit has held that when a defendant
18 voices a seemingly substantial complaint about counsel, the trial judge should make a thorough
19 inquiry into the reasons for the defendant's dissatisfaction. Id. at 1475-76. The inquiry need
20 only be as comprehensive as the circumstances reasonably would permit, however. King v.
21 Rowland, 977 F.2d 1354, 1357 (9th Cir. 1992) (record may demonstrate that extensive inquiry
22 was not necessary). The ultimate inquiry in a federal habeas proceeding is whether the
23 petitioner's Sixth Amendment right to counsel was violated. Schell, 218 F.3d at 1024-25. That
24 is, the habeas court considers whether the trial court's denial of or failure to rule on the motion
25 "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and
26 his attorney had become so great that it resulted in a total lack of communication or other
27 significant impediment that resulted in turn in an attorney-client relationship that fell short of
28 that required by the Sixth Amendment." Id. at 1026.

1    Here, respondent notes that prior to trial, petitioner made several motions to substitute
2 appointed counsel. (CT 86, 88, 96, 97, 103, 183.) With respect to all three of the motions, the
3 court minutes reflect that the motions were argued and denied. (Id.) Respondent points out that
4 petitioner's claim refers to the last Marsden motion, made three days prior to trial, and states that
5 the court held a Marsden hearing, which was closed to the prosecutor, and denied the motion.
6 (RT 1505-19.) Petitioner, on the other hand, does not argue that he and his trial counsel had any
7 underlying conflict that would implicate his Sixth Amendment right to counsel. Petitioner
8 merely makes a single statement that the trial court did not "look into" the motion. Without
9 more, this court cannot say that the state courts' rejection of this claim was contrary to, or an
10 unreasonable application of, clearly established Supreme Court law.

## CONCLUSION

The petition for a writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights, or demonstrate that a reasonable jurist would find the denial of his claims debatable or wrong. Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The clerk shall terminate all pending motions, enter judgment, and close the file.

IT IS SO ORDERED.

DATED: _____

/s/ Ronald M. Whyte
RONALD M. WHYTE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

GONZALES et al,

        Plaintiff,

v.

LEOTTI et al,

        Defendant.

Case Number: CV11-03235 RMW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on April 8, 2014, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Artemio Gonzales F37380
Department of Corrections and Rehabilitation
Q3-310
PO Box 2000
1600 California Drive
Vacaville, CA 95696

Dated: April 8, 2014

        Richard W. Wieking, Clerk
        By: Jackie Lynn Garcia, Deputy Clerk